IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ADJOH DORCAS MANOU EPSE ASSOKO,<br><br>Defendant. | Case No. 1:24-CR-172 |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, by and through undersigned counsel, hereby submits its position on the sentencing of the defendant, Adjoh Dorcas Manou Epse Assoko, who, after a jury trial, was found guilty of international parental kidnapping, in violation of 18 U.S.C. § 1204. The United States submits that the Sentencing Guidelines are appropriately calculated and establish a reasonable sentencing range that accounts for each of the factors set forth in 18 U.S.C. § 3553(a). Given the great and irreparable pain the defendant intentionally inflicted on her estranged husband, as well as her continued lack of remorse, the government requests that this Court impose a high-end sentence of 24 months, followed by a one-year term of supervised release.

### I. BACKGROUND

By the time the defendant gave birth to Jane Doe in August 2023, her marriage to John Assoko was already unraveling, strained by disagreements over finances and the defendant's jealousy concerning John's affection for his niece, who she perceived John loved more than he did the three children she had from a prior relationship. *See, e.g.,* Gov't Trial Ex. 401-A at 8. By November 1, 2023, at the defendant's insistence, John moved out of their shared home, operating

under the understanding that he would have shared custody of Jane Doe. *See id.* at 8-10. However, just two weeks after John left the home, the defendant sent John a separation agreement designed to secure a substantial financial windfall for herself and, soon thereafter, began conditioning his access to Jane Doe on him either signing the document or initiating separation proceedings. *See* PSR ¶¶ 11-13. When John did not comply immediately, the defendant escalated matters, launching a calculated and systematic campaign to destroy him emotionally and financially.

First, the defendant applied for and obtained a protective order against John by falsely claiming that in August 2023, he had attempted to strangle her in the middle of the night and that he thereafter continued to verbally and physically abuse her until, in response to her threats to call the police, he moved out on November 1. PSR ¶ 14. She further claimed that he was presently threatening to harm her and Jane Doe if she filed for separation because his visa, which he had acquired through his marriage to her, would be canceled. PSR ¶ 14. The protective order served to provide the terms of the couples' custody arrangement until the issue could be fully litigated and decided by the judge presiding over their divorce case. The order awarded custody to the defendant and visitation to John every week from Friday through Sunday and named a third-party intermediary to handle the baby's pick-ups and drop-offs necessary for John's visitations. PSR ¶ 17.

Not satisfied with having significantly curtailed John's access to his child, the defendant also secured criminal charges against the defendant based again on the false claim that John had attempted to strangle her.[1] PSR ¶ 15. John was arrested, jailed, and subjected to pretrial restrictions before the charges were ultimately dismissed. *See* PSR ¶ 16 and Victim Impact Statement, PSR p.

---

[1] This time, however, the defendant claimed that the alleged strangling attempt had taken place on October 7, 2023, and that he had done so due to the defendant having refused to sponsor a visa for his parents or his niece.

26. Unfortunately, the mere fact that John was charged resulted in him being terminated from his job as a teacher. *See id.* Yet the defendant remained determined to cause even more suffering, and in February 2024, she cut off John's access to Jane Doe entirely, refusing to turn her over to the intermediary for John's visitation periods. *See* PSR ¶¶ 21, 27.

In what was likely an attempt to justify her conduct, the defendant filed yet another petition for an order of protection, this time on behalf of Jane Doe and her 17-year-old son. A hearing on the petition was held on April 9, 2024, during which both John and the defendant testified. *See* Gov't Ex. 2, April 9 Hr'g Tr. Excerpts, at US-002084. During this proceeding, however, both parties were represented by counsel, which resulted in John, for the first time, being able to introduce evidence and cross-examine the defendant. *Id.* at US-002083-84. During her cross, the defendant conceded that she had previously made the same strangling allegation against a prior ex-husband during their divorce proceedings. *See id.* at US-002177, line 11, through US-002178, line 10. After hearing the testimony from both parties, the court found no evidence of abuse or neglect and denied the defendant's requested protective orders. *See id.* at US-002244, line 9, through US-002247, line 3; US-002250, lines 4-6; US-002251, lines 4-5.

Two days later, presumably fearing another unfavorable result, the defendant failed to appear at her show-cause hearing on one of John's several contempt petitions.[2] PSR ¶ 25. During the hearing, the court amended the protective order to require the parties to exchange the child at the police station, since the defendant had been refusing to allow the intermediary to pick up the baby. *Id.* This amendment, however, did not bring about the hoped-for change, as the defendant

---

[2] The defendant later falsely claimed that she had been too weak from a recent surgery to attend. Whatever medical treatment that the defendant received, however, was done prior to the April 9 hearing, which she had managed to attend. Moreover, World Bank records revealed that she had returned from leave on April 11. *See* Gov't Trial Ex. 502.

still refused to honor the terms of the order—this time claiming that an exchange at a police station was "unhealthy" for the baby. *See* PSR ¶ 27. So, John petitioned the court yet again, and on April 26, 2024, the defendant was served with this latest petition and show-cause order. PSR ¶ 28. An earlier petition was likewise to be addressed at the parties' upcoming *pendente lite* hearing, which was scheduled for May 14, 2024. PSR ¶ 24.

Meanwhile, throughout this time, the defendant had been relentlessly attempting to have John's G-4 visa deregistered with the State Department. None of these attempts was successful. *See* PSR ¶¶ 39-42.

It is against this backdrop that on April 30, 2024, after having secretly obtained a U.S. passport for Jane Doe, *see* Gov't Trial Ex. 702, the defendant fled to her native Côte d'Ivoire with Jane Doe, without John's knowledge or consent, PSR ¶ 29. That same day, the defendant filed a motion to dismiss the protective order and the divorce proceedings, explaining that the whole family would now have to move back to Côte d'Ivoire, claiming that her employment in the United States had ended, requiring her return—and that of her dependents—to Côte d'Ivoire under the terms of her visa. PSR ¶ 29. It was only upon his attorney's receipt of this filing that John learned that the defendant had taken Jane Doe out of the country. PSR ¶ 32. He thereafter immediately filed an emergency motion seeking sole custody of Jane Doe. PSR ¶ 31.

During the hearing on John's emergency motion, which took place on May 9, 2024, the defendant, who appeared by Zoom, claimed that she had left the United States because her job with the World Bank had been reassigned to Côte d'Ivoire, and as a result, the defendant and her dependents would lose their G-4 visa status. PSR ¶¶ 32-33; Gov't Trial Exs., 300 Series. The defendant repeatedly represented that her new work assignment was to begin on June 1, at which

time her visa—and those of her dependents, including John—would become void and that she had had no choice in the matter. *Id.*

In fact, however, World Bank records revealed that this move was entirely of the defendant's own making, and that nothing had been approved—at least not formally so—by the time she left the country with Jane Doe. *See* PSR ¶ 25. Specifically, the defendant elected to go on what the World Bank calls "Extended Service Without Pay" ("ESWOP"), which is essentially akin to a sabbatical. While still affiliated with the World Bank, she would temporarily work for a World Bank approved organization, the African Development Bank. By the time the defendant made these representations to the court, however, her ESWOP had not yet been approved. To the contrary, World Bank records established the following timeline:

- On May 2, 2024—after the defendant had already left the country—the defendant requested and received approval to telework from Côte d'Ivoire from May 2, 2024 through May 31, 2024. *See* PSR ¶ 35; Gov't Trial Ex. 503. Importantly, this would not have "voided" the defendant's visa—as the defendant well knew, teleworking outside of the United States for a period in *excess* of 30 days may cause one's visa to be "unregistered" with the State Department. *See* Gov't Trial Ex. 627 (World Bank HR document advising the same, which the defendant sent to her personal email).

- It was not until May 9, 2024—the day of the hearing—that the defendant requested and received approval to extend her telework to May 2, 2025. Gov't Trial Ex. 504.

- The formal approval process for the defendant's ESWOP did not begin until June 20, 2024; the term of the assignment was from July 1, 2024 through June 30, 2025. *See* Gov't Trial Exs. 505, 506.

In sum, the World Bank documents make clear that none of the defendant's representations to the court were true. Unaware of these falsehoods, the court graciously gave the defendant a deadline by which to return Jane Doe to the United States so that John could exercise his parental rights. PSR ¶ 33. The defendant, however, claimed she did not have enough money to return to the United States and advised that she would not be coming back. PSR ¶ 33. The judge then entered an order granting temporary sole custody of Jane Doe to John. PSR ¶ 34.

On June 19, 2024, using her G-4 visa (which, contrary to her representations to the court, had not been "voided"), the defendant flew back to the United States to attend to personal matters. *See* PSR ¶ 36. She did not, however, return with Jane Doe, despite having been ordered to do so. PSR ¶ 36. On June 26, 2024, the defendant was arrested at the airport attempting to return to Côte d'Ivoire. PSR ¶ 37. Following her arrest, the defendant voluntarily spoke with the FBI and repeated the same false claims summarized above. *See* PSR ¶ 37. The defendant also steadfastly refused to provide the agents with any information about Jane Doe's whereabouts, other than confirming that she remained in Côte d'Ivoire. PSR ¶ 37.

After holding the government to its burden of proof by denying the essential factual elements of guilt, a jury found the defendant guilty as charged. Thereafter, this Court added a special condition to the terms of her release, requiring her to appear at all of her family court hearings. Accordingly, the defendant appeared at a series of hearings in family court on October 15-17, 2024, during which both she and John testified. *See* PSR ¶ 44. Part of that hearing was devoted to addressing the defendant's contempt of the May 9 order awarding John temporary full custody. To that end, the court found the defendant in contempt for "having failed to return Jane Doe to [John's] custody, having failed to direct a third party to return [Jane Doe] from Côte d'Ivoire, having failed to cooperate with [John's] attempts to return [Jane Doe], and having refused to answer questions at the hearing[.]" Gov't Ex. 1, Family Law Mem. Opinion, p. 2. Consequently, the defendant was sanctioned to incarceration for up to six months, with the ability to purge the contempt by returning Jane Doe to John's custody. *Id.* at p. 3. After spending two nights in jail, the defendant finally allowed for Jane Doe to be returned to the United States and to John's custody. *Id.* The two were reunited on October 25, 2024. *Id.* at p. 4.

The family court made a number of written findings in its subsequent opinion granting John sole physical and legal custody. As relevant here, the court found that the defendant's testimony had not been credible with respect to "the breakdown of her marriage, her allegations of domestic abuse, the custody arrangements during the separation, and her decision to take Jane Doe out of the United States." *Id.* at 2. The court further noted that while the defendant acknowledged that she had violated the law, she nonetheless "continued to defend her actions and refused to acknowledge any responsibility related to the custody dispute[.]" *Id.*

## II. SENTENCING ANALYSIS

As this Court is aware, to determine the appropriate sentence, the Court must consult both the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a). *See, e.g., United States v. Booker*, 543 U.S. 220, 264 (2005); *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). Specifically, a sentencing court must first calculate the applicable Guidelines range after making the appropriate findings of fact. *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Relying on that range as "the starting point and the initial benchmark," the sentencing court must then "consider all of the § 3553(a) factors" before imposing a sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Section 3553 states that the court should consider the nature and circumstances of the offense and characteristics of the defendant. In addition, it states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B).

The sentence imposed must meet a standard of reasonableness, *see Booker*, 125 S. Ct. at 765, and as the Fourth Circuit has stated, "reasonableness is not measured simply by whether the

sentence falls within the statutory range, but by whether the sentence was guided by the Sentencing Guidelines and by the provisions of § 3553(a)." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). That said, a sentence imposed within the properly calculated Sentencing Guidelines range is presumptively reasonable. *Id*. Moreover, a court's reasons for not applying the properly calculated Sentencing Guidelines range must be based on the statutory sentencing factors. *Id*.

### A.     Guidelines Calculation

As set forth in the PSR, the base offense level for a violation of 18 U.S.C. § 1204 is 14. *See* PSR ¶ 53; U.S.S.C. §2J1.2(a). And, because the offense resulted in substantial interference with the administration of justice, a three-level enhancement applies. PSR ¶ 54; U.S.S.G. § 2J1.2(b)(2). Given the defendant's status as a "Zero-Point Offender," her adjusted offense level of 17 is reduced by two levels under U.S.S.G. § 4C1.1(a) and (b), resulting in a total offense level of 15. PSR ¶¶ 59-61. As such, her resultant Guidelines range is 18-24 months' imprisonment.

### B.     Defendant's Objections

The defendant objects to the application of the three-level enhancement for having substantially interfered with the administration of justice and to the lack of any reduction for her acceptance of responsibility. Both objections are meritless.

#### i.     The offense substantially interfered with the administration of the family court proceedings.

Under U.S.S.G. § 2J1.2, a three-level enhancement applies "[i]f the offense resulted in substantial interference with the administration of justice[.]" Application Note 1 to this guideline explains: "'Substantial interference with the administration of justice' *includes* a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary

expenditure of substantial governmental or court resources." U.S.S.G. §2J1.2, cmt. n.1 (emphasis added).

The defendant first argues that, because the present case did not involve any of the above-listed acts the Commission included as constituting "substantial interference," the enhancement does not apply. To support her argument, the defendant claims that, with respect to the family court proceedings, "[t]he only expenditure of court resources" was limited to "divorce and custody proceedings that were instigated before the conduct and [which were] necessary given the breakup of the marriage[.]" Def.'s Obj., PSR p. 23. As an initial matter, this argument is factually inaccurate, as it ignores the lengthy May 9, 2024 hearing that the family court convened solely to address the defendant's unlawful removal of Jane Doe from the United States. In other words, the May 9 hearing was not a typical hearing that would have happened in the ordinary course of the divorce proceedings had the defendant not abducted Jane Doe. To the contrary, the sole purpose of the hearing was to address the defendant's unlawful interference with her estranged husband's parental rights by removing and retaining Jane Doe outside of the United States. The argument likewise ignores the amount of time that the family spent in trying to ensure Jane Doe's safe return to the United States after the defendant was convicted. *See* Gov't Ex. 1 at 1-3. In both instances, substantial court resources were expended not as an ordinary part of the couple's divorce proceedings but solely due to the defendant having unlawfully removed and retained Jane Doe outside of the United States.

More fatal to the defendant's claim, however, is its faulty premise—namely, that the Application Note's list of acts constituting substantial interference is exhaustive. As the Second Circuit pointed out, the list is preceded by the term "includes," which "clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if

similarly or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997). *See also United States v. Newman*, 614 F.3d 1232, 1236 (11th Cir. 2010) ("Because the term "'includes' is not exhaustive," the definition of 'substantial interference with the administration of justice' in § 2J1.2 is not limited to the examples set out in the guidelines." (quoting U.S.S.G. §1B1.1 cmt. nt. 2)).

In *Amer,* the defendant and his wife had been physically, but not legally, separated when he abducted their two children and took them to Egypt. 110 F.3d at 875-77. Shortly thereafter, the mother sought and obtained a custody order granting her legal guardianship. *Id.* at 877. The defendant appealed the district court's application of the enhancement, claiming that it only applied to conduct that disrupted an *ongoing* proceeding and therefore could not apply to him, since he took his children to Egypt before his wife sought formal custody from the state court. *Id.* at 885. In rejecting this argument, the Second Circuit agreed with the district court's finding that the defendant's conduct was, in fact, "more egregious" than the non-exhaustive list of acts in Application Note 1, "because rather than terminating a judicial proceeding by his actions, he made certain that the action was one that would never be commenced." *Id.* Indeed, by his actions, the defendant had "deemed himself the judge, and then he made the decision . . . wholly ignor[ing] the lawful process, and acting in the form of a vigilante[.]" *Id.* In affirming, the Second Circuit held that, "[a]lthough the abduction did not interfere with an ongoing proceeding, this act prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice," and as such, merited the enhancement. *Id.*

Similarly, the Eleventh Circuit affirmed application of the enhancement to a defendant's violation of a custody decree where the district court found that the defendant's decision to abduct

Page **10** of **16**

and secret away his child in the Middle East had been motivated by his dissatisfaction with the state court's decision awarding his ex-wife primary custody. *See Newman,* 614 F.3d at 1234, 1237. The Eleventh Circuit found that the defendant's "actions were calculated to thwart the legal custody process and to ensure that he, and not a judge with jurisdiction over custody matters, would be the ultimate decisionmaker about who would retain custody of his child." *Id.* at 1238. As such, his sentence was properly enhanced under U.S.S.G. § 2J1.2(b)(2). *Id.*

In this case, the record establishes that, leading up to the defendant's abduction of Jane Doe to Côte d'Ivoire, the following events took place:

- On April 9, 2024, in denying the defendant's petition for protective orders on behalf of Jane Doe and her minor son, the circuit court judge declared, in front of the defendant, that it did not "see how any reasonable person would feel threatened by" the social media posts and texts that she had presented in support of her claims that John had made threats of violence. *See* Gov't Ex. 2 at US-002247.

- On April 11, a Maryland State district court judge held a hearing on John's petition for contempt against the defendant; the defendant failed to appear. During the hearing, at John's request, the judge modified the terms of the controlling custody order to require the visitation transfers of Jane Doe to take place at a police station, given her failure to abide by the initial terms. *See* PSR ¶ 25.

- On April 26, the defendant had been served with yet another petition for contempt and show-cause order due to her refusal to allow John to exercise his paternal rights since February. PSR ¶ 28.

- The *pendente lite* hearing, during which John—now, through an attorney—would be seeking custody of Jane Doe, and during which John's contempt allegations against the defendant were to be heard, was scheduled for May 14, 2024. PSR ¶ 24.

- The defendant's efforts to terminate John's visa had been unsuccessful. PSR ¶¶ 39-43.

In sum, the defendant knew that it was only a matter of time before John would finally have his day in court and her inexcusable, repeated interference with John's parental rights would be exposed. The record thus supports a finding that the defendant's flight to Côte d'Ivoire with Jane Doe was calculated to ensure that she—and not the judge at the upcoming contempt and/or

*pendente lite* hearing—would be the ultimate decisionmaker about who would retain custody of Jane Doe The enhancement, therefore, is properly applied. *See Newman,* 614 F.3d at 1238; *Amer,* 110 F.3d at 885.

The enhancement is supported on the similar ground that the defendant retained Jane Doe in Côte d'Ivoire in wanton disregard of the family court's May 9, 2024 order granting John temporary sole custody and ordering the defendant to return Jane Doe to the United States. At the time of that hearing, the defendant claimed that she lacked the funds to be able to comply with that order—a claim belied by the defendant's own return to the United States the following month to attend her farewell party. The defendant's retention of Jane Doe in defiance of that order was plainly motivated by her dissatisfaction with the family court's decision awarding John custody, thereby meriting the sentencing enhancement on this additional basis. *Newman,* 614 F.3d at 1238.

### ii. To this day, the defendant fails to accept responsibility.

The defendant's claim that she has accepted responsibility is just as easily dismissed. Under U.S.S.G. § 3E1.1(a), a defendant who "clearly demonstrates acceptance of responsibility" for her offense is entitled to a two-level decrease. In determining whether a defendant has clearly demonstrated acceptance of responsibility, appropriate considerations include, importantly, the defendant "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1, cmt. n.1. Moreover, this reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* at cmt. n.2.[3] In this case, the defendant claims she is entitled to a

---

[3] A defendant who takes her case to trial is not *automatically* precluded from receiving a reduction

reduction based on having "taken active steps to bring Jane Doe back to the United States" within days of her conviction. Whatever steps she may have taken in those first days, she failed to follow through on any of them. It was not until her release from jail was conditioned upon Jane Doe's return that the defendant allowed for the return to occur. And, had it not been for this Court conditioning her release on attending her family court hearings, it is safe to assume, given her prior failures to appear, she would have done the same, continuing to leave John without any means of redress. Therefore, any credit for Jane Doe's return is owed to the courts, John's counsel, and defense counsel—not the defendant.

Moreover, the defendant's final acquiescence to the family court's lawful orders is not a demonstration of her acceptance of responsibility. To this day, the defendant has yet to truthfully admit her guilt in this case. To the contrary, she has continued to make false representations in an effort to justify her behavior. *See* PSR pp. 22-23. Consequently, the PSR appropriately withheld application of the two-level reduction under U.S.S.G. § 3E1.1.

### C.  Section 3553(a) Factors

The defendant's abduction of Jane Doe marked the culmination of a calculated, months-long campaign to devastate her estranged husband, inflicting maximum pain and wreaking havoc in every facet of his life. Central to this scheme was the defendant's deliberate manipulation of the judicial system. Notably, it was her successful acquisition of a protective order against John—secured through perjured testimony—that enabled her to obtain Jane Doe's passport without his knowledge. This critical act facilitated the commission of the offense at hand. Not only did the

---

under U.S.S.G. § 3E1.1, though it is exceedingly rare that such a defendant will receive a reduction for acceptance of responsibility. *See id.* at cmt. n. 2 (noting that such a reduction might be appropriate where a defendant only goes to trial to assert or preserve issues unrelated to factual guilt).

defendant's deceitful exploitation of the court system result in her obtaining a favorable custody arrangement, but it also led to John being wrongfully charged, compounding his suffering, both emotionally and financially. As noted in the PSR, John has spent at least $30,000 trying to enforce his parental rights, including his attempts to have Jane Doe returned to the United States. PSR ¶ 46. Above all, the sentence must reflect the profound pain and suffering endured by John during the prolonged period Jane Doe remained in Côte d'Ivoire. It must acknowledge the anguish of not knowing who was caring for her, whether she was safe, the relentless fear of never seeing her again, and the milestones, such as her first birthday, that he was deprived of sharing with her.

In sum, the United States submits that a sentence of 24 months' imprisonment is necessary to fully reflect the gravity of her calculated wrongdoing and its devastating consequences. *See* 18 U.S.C. § 3553(a)(1) (mandating consideration of the nature and circumstances of the offense and the history and characteristics of the defendant); 18 U.S.C. § 3553(a)(2)(A) (requiring the sentence imposed to reflect the seriousness of the offense and provide just punishment). The recommended high-end sentence is likewise necessary to promote respect for the law, given the defendant's demonstrated woeful lack thereof. 18 U.S.C. § 3553(a)(2)(A). Finally, a meaningful sentence is important if the end of general deterrence is to be served. 18 U.S.C. § 3553(a)(2)(B).

## III. CONCLUSION

For the reasons above, the United States respectfully requests that the Court impose a sentence of 24 months' imprisonment, followed by a 1-year term of supervised release, and a special assessment fee of $100.

                                          Respectfully submitted,

                                          Jessica D. Aber
                                          United States Attorney

Date: January 8, 2025                  By:   */s/ Meredith J. Edwards*
                                            Meredith J. Edwards
                                            Assistant United States Attorneys
                                            United States Attorney's Office
                                            2100 Jamieson Avenue
                                            Alexandria, Virginia 22314
                                            Phone: (703) 299-3700
                                            meredith.edwards@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2025, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

                                                      */s/ Meredith J. Edwards*
                                                      Meredith J. Edwards
                                                      Assistant United States Attorneys
                                                      United States Attorney's Office
                                                      2100 Jamieson Avenue
                                                      Alexandria, Virginia 22314
                                                      Phone: (703) 299-3700
                                                      meredith.edwards@usdoj.gov